LANCASTER GLASS CORPORATION,
Plaintiff–Appellee,

v.

PHILIPS ECG, INC.; and GTE Products
Corporation, Defendants–Appellants.

Nos. 86–3926, 86–4049.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 2, 1987.

Decided Dec. 17, 1987.

---

Melvin D. Weinstein, argued, S. Noel Melvin, Emens, Hurd, Kegler & Ritter, S. Martijn Steger, Columbus, Ohio, for defendants-appellants.

Alan L. Briggs, Steven W. Tigges, argued, David J. Young, Murphy, Young & Smith, Columbus, Ohio, for plaintiff-appellee.

Before MARTIN and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Lancaster Glass Corporation, a manufacturer and seller of glassware, brought this diversity action against Philips ECG, Inc., and GTE Products Corporation to recover the contract price for bulbs Philips contracted to purchase but refused to accept.[1] Philips defended on the ground that the tendered bulbs were defective. Philips also counterclaimed to recover for allegedly-defective bulbs it had already paid for. At the conclusion of a bench trial, the district court entered a judgment against Philips

1. Originally, the contract in dispute was between Lancaster and GTE. On January 21, 1981, the GTE division responsible for the matters at issue was sold to Philips. Both defendants are collectively referred to in this opinion as "Philips."

for $714,511.23. The district court subsequently added $26,463.20 to the award for additional prejudgment interest.

## I.

At the heart of this dispute is an electronic glass bulb known as the LEA–1015B. The LEA–1015B was manufactured by Lancaster and sold to manufacturers of cathode ray tubes. Philips is one such manufacturer.

## A.

The LEA–1015B is essentially an empty television picture tube made entirely of glass. The bulb consists of three parts: the faceplate, the funnel, and the neck. The diagonal measurement of the faceplate is 12 inches. Lancaster first designed and produced the bulb in 1964, and the latest drawing revision is dated February 2, 1973. When Philips began purchasing LEA–1015B bulbs, it requested and received a copy of Lancaster's engineering drawing for the bulb. Philips provided copies of the drawing to its customers to assist them in selecting and ordering television and display monitor tubes made from LEA–1015B bulbs.

During the 1970's, Philips became one of Lancaster's largest customers, and the LEA–1015B was the largest volume item sold by Lancaster to Philips. From 1974 to 1979, Philips purchased more than a half-million of the bulbs, including more than 200,000 in 1979 alone. Throughout this period, though, Philips also purchased 12-inch bulbs from other suppliers. Lancaster last produced the LEA–1015B in 1980.

After buying the bulbs from Lancaster, Philips converted them into cathode ray tubes for eventual use as computer screens and similar video display monitors. Philips' standard procedure was to install various electronic components into the bulb, coat the interior, and then draw the air out of the bulb to create a vacuum. Philips then placed the sealed tubes into storage

until an order was placed by one of its customers.

After Philips received an order, it would treat the tubes with "implosion protection." Because the sealed tubes are under a vacuum, the glass is subject to excessive atmospheric pressure. If a hole is made through the face of the tube, this pressure will cause the glass all around the tube to implode. To minimize the risk of violent implosions, and to meet industry safety requirements, Philips would provide implosion protection systems to the finished tubes. Implosion protection systems prevent the glass in the tubes from flying outward and causing injury if the tubes are shattered. The two implosion protection systems most prevalent during the relevant time period were "shellbonding" and "T-banding." Shellbonding, whereby a seal is placed over the face of the tube, was the traditional method. T-banding is a more recent innovation.

In T-banding, a steel strip is placed around the perimeter of the bulb and then tightened. When the T-band is tightened, it compresses the glass, making the tube more resistant to implosion. The T-band serves another purpose, as well. Before a T-band is tightened around a tube, a metal, L-shaped "ear" with holes in it is placed beneath the T-band at each of the four diagonal corners of the tube faceplate. These ears act as mounting fixtures that enable Philips' customers to install the tubes in their cabinets or chassis. T-banding replaced shellbonding as the predominant implosion protection system because T-banding was a less-expensive process and because a T-banded tube can fit into a smaller cabinet. This shift to T-banding was not unique to Philips and was known by Lancaster.

Because of the dual functions which a T-band performs, though, it is critical that the T-band not move or slip on the tube after the band is tightened. If a T-band slips, the tube is no longer held in compression, and the implosion protection which the T-band would otherwise provide is compromised. In addition, slippage of a T-band causes the metal ears to move so that the

tube will no longer fit properly into the customer's cabinet or chassis.

**B.**

The events relevant to this case occurred over a span of 16 months. The contract had its beginning in January 1980 when Philips ordered 20,000 LEA–1015B bulbs. Releases on this order were made throughout the month, and the final release was on January 31, 1980. This final release, however, included an additional 1,029 bulbs not previously ordered by Philips. Lancaster discovered the over-shipment the following day, February 1, and Lancaster called Philips to ask how to handle the matter. Philips told Lancaster that it needed an additional 20,000 bulbs anyway so the 1,029 overshipment could just be considered part of this new order. The parties agreed to a price of $8.90 per bulb.

But the terms of this new order changed. One week after the order for 20,000 bulbs was placed, officials of both companies met to discuss Lancaster's 1980 bulb prices and Philips' 1980 bulb needs. Because Philips' sales forecasts were very favorable while Lancaster was predicting substantial cost increases, a Lancaster official suggested that it would be mutually advantageous for Philips to place a large order then so that Lancaster could buy the necessary materials immediately at the lowest possible price. Lancaster then offered to sell the LEA–1015B at $8.25 each if Philips would increase its outstanding order to 100,000 bulbs.

On February 14, 1980, Philips called Lancaster to say that it would accept the offer. Philips then placed an order for 101,029 LEA–1015B bulbs, the first 1,029 (those already released on January 31, 1980) at $8.90 each and the remaining 100,000 bulbs at $8.25 each. After placing this order, Philips prepared one of its standard purchase orders and sent it to Lancaster. The appropriate Lancaster employee signed the purchase order, and Lancaster returned it to Philips.

The purchase order contained several provisions relevant to this dispute. A section entitled "WARRANTIES" provided:

Seller warrants that all goods … provided by it (i) shall be … free from defects, … (ii) shall conform to all specifications, drawings, [and] descriptions furnished, specified or adopted by buyer, (iii) shall be merchantable and suitable and sufficient for their intended purposes and (iv) shall be free of any claim of any third party.… Buyer's … acceptance of and/or payment for goods shall not constitute a waiver by it of any warranties. Buyer's … acceptance of any goods shall not relieve Seller from responsibility to deliver goods … conforming to specifications, drawings and descriptions.

A section entitled "CANCELLATION AND REMEDIES" provided:

Buyer may cancel this order in whole or in part if (i) the goods … furnished do not conform to warranties.… In the event of any such cancellations, Buyer shall have the rights … (i) to refuse to accept delivery of goods … [and] (ii) to recover all payments made therefore.…

The purchase order also provided that shipment of the order was to be "as released." Lancaster understood this language to mean that the order was to be completed in calendar year 1980.

At the time the order was increased, Lancaster had some glass in inventory, but not enough to cover the entire order. By the end of April 1980, however, Lancaster had made enough inventory of parts to fabricate the 100,000 bulbs. Lancaster had produced all of the parts by that time in order to avoid an expected cost-increase later in the year.

Lancaster began to release completed bulbs pursuant to the contract in March 1980. In April 1980, however, Philips was notified by one of its customers that the T-bands on a shipment of tubes made from 12-inch bulbs had slipped. Philips examined the returned tubes, and it discovered that all of the tubes with slipped bands had been made from Lancaster's LEA–1015B bulbs. But Philips continued to request new releases until the end of June 1980. At that point, Philips had accepted and paid for over 15,000 bulbs.

Despite Philips' efforts to prevent T-bands from slipping, the band slippage problem continued. Philips' engineers began to suspect that the band slippages were related to the size of the diagonal panel skirt taper angle, the angle at each of the four diagonal corners of the bulb faceplate. Lancaster's engineering drawing shows the diagonal angle to be one-and-one-half degrees, with no "tolerance" indicated. Other dimensions on the drawing have "tolerances," that is, plus and/or minus symbols follow the dimensions indicating that there is a specific range within which the bulb may vary from the drawing and yet still be considered in conformance with it. Because Philips had difficulty measuring the angles, Philips sent three bulbs to Owens–Illinois for measurement during the summer of 1980. From this examination, Philips learned that some of the angles on these bulbs exceeded one-and-one-half degrees. At the same time, however, the market for 12-inch tubes declined; Philips' predictions for a banner year were proving inaccurate.

In August 1980, Philips first raised the T-band slippage problem with Lancaster. On August 1, Robert Corson, a Philips engineer, advised Lancaster's sales manager that Philips had been experiencing T-band slippage on the Lancaster bulb. Corson, though, also reported that T-bands were slipping on 15-inch bulbs manufactured by Lancaster's competitors. Two weeks later, Corson called Landes to request a meeting to discuss the T-banding problem.

Officials of both companies met on August 18, 1980. After reviewing Philips' transition from shellbonding to T-banding, Corson requested Lancaster's help in finding a solution to the T-band slippage problem, and he suggested that the T-banding system might work better if the diagonal angle were straighter. After reviewing the measurements performed by Owens–Illinois, a Lancaster official agreed that Philips' suggested approach was probably a good one, but he noted that this modification would require a change in the mold

that Lancaster used to make the bulbs.[2] Therefore, Lancaster offered to change the molds on future runs, but only after Philips had depleted the existing inventory for the February 1980 order. Philips did not object to this arrangement at the meeting.

At the beginning of September, there were still more than 84,000 bulbs to be released on the order. Concerned that the order was far behind schedule and would not be completed by year-end, Lancaster sent a 1981 price list to Philips. This list informed Philips that the prices of the LEA–1015B would increase from $8.25 to $9.40 effective December 31, 1980.

Shortly thereafter, Philips responded by calling Lancaster. Philips advised that its sales had dropped drastically and that Lancaster's competitors were holding the line on bulb prices through 1981. Philips reiterated these points in a November 7, 1980 letter, and a letter dated December 2, 1980 repeated Philips' request for "price consideration for all or part of 1981." When this request was denied, Philips again wrote to Lancaster asking for a price concession on the LEA–1015B. But Philips never mentioned the T-banding problem in its correspondence concerning the February 1980 order.

The slippage issue did not resurface in discussions between the parties until January 1981. In negotiations over the outstanding order, Philips pointed out that, despite its persistent efforts, it had not been able to solve the T-band slippage problem. Philips engineers had employed several new methods in T-banding the problem bulbs, but even the successfully-rebanded LEA–1015Bs failed the required implosion tests. The official who conducted these negotiations on behalf of Philips testified, however, that he brought up T-band slippage "as a negotiating ploy" in an effort to secure a price concession from Lancaster.

These negotiations continued until January 29, 1981, when the parties finally reached an agreement. Philips sent Lancaster a letter expressing its understanding of the parties' settlement. The letter, which set out the proposed schedule of release dates which Philips had accepted, was sent in order to be sure that both parties understood "all [of the] details they had agreed upon." Philips concluded by saying that the letter "settle[d] all matters pertaining to the [February 1980] order."

Philips, however, was unable to abide by this settlement. Throughout February 1981, Philips continued to accept bulbs and pay for them in accordance with the January 29 agreement. But, beginning in March, Philips again sought relief from its contractual obligations. At a meeting on March 18, 1981, Philips asked Lancaster to defer some of the release deadlines established in the agreement, complaining about its "poor market situation." Three weeks later, Philips called Lancaster because it was "looking for ways to stem red link in [its] operations," and it asked what the cancellation charges would be on the remaining balance of the February 1980 order. When Lancaster replied that those charges would be approximately 90% of the outstanding order cost, Philips said it would finish the order as planned. Throughout these discussions, however, Philips did not mention the T-banding issue.

On April 13, 1981, a Lancaster representative visited the Philips plant to review accumulated scrap bulbs for credit. The normal credit procedure was for Philips to process the bulbs prior to a thorough inspection. Philips would then set aside any bulbs which it felt were defective. A Lancaster representative would periodically visit the plant to review the collection of allegedly-defective bulbs and decide whether credit should be given. During this visit, Philips did not request credit for bulbs with slipped T-bands. Even during

---

**2.** In order to produce bulb faceplates with diagonal angles of one-and-one-half degrees, the molds were designed to have diagonal angles of one-half degree. The reason for the one-degree disparity between the angle of the mold and the corresponding angle in the bulb is that molten glass is poured into the molds to form the shape of the faceplate. As that molten glass cools, it contracts, with the result that the diagonal angles on the faceplate are larger than the diagonal angles in the mold.

prior discussions when Philips had raised the slippage issue, it had never requested credit authorizations for the bulbs on which the T-bands had slipped.

On April 23, 1981, however, Philips called Lancaster to ask for a meeting to discuss the T-banding problem. Apparently, Philips had discovered that it had a computerized machine which could make precise measurements of the diagonal angles on LEA–1015B bulbs. During April, Philips used this machine to measure each of the four diagonal angles on a sample of 25 bulbs. The results showed that 92 of the 100 angles measured exceeded the one-and-one-half degrees dimension shown on the engineering drawing, and 53 angles were greater than three degrees. Overall, 24 of the 25 bulbs measured by Philips had diagonal angles averaging in excess of one-and-one-half degrees. Philips did not, however, perform a test which could establish a causal relationship between the size of the angle and the rate of T-band slippage. On April 24, Philips told Lancaster that it would not accept any further deliveries of the bulbs until a meeting was held.

On May 13, 1981, the parties met, and Philips showed Lancaster the results of the measurements it had taken. Philips claimed that the excessive angles were causing the T-band slippage problem and that this problem was preventing it from being able to use the bulbs. Philips then demanded that Lancaster extend return credit for the bulbs which Philips had in inventory, and Philips stated that it would not accept delivery of the LEA–1015B bulbs remaining under the February 1980 contract.

Lancaster rejected Philips' demands.

## II.

The resulting litigation involves several claims and counterclaims. Lancaster sued Philips to recover the purchase price of 13,923 bulbs for which Philips had taken delivery but not paid. Lancaster also sought to recover the purchase price of 36,113 bulbs which Philips refused to accept under the contract. Finally, Lancaster sued to recover the purchase price of LEA–1131B bulbs that Lancaster had sold to Philips pursuant to another contract.[3] Philips counterclaimed to recover the purchase price of 21,483 bulbs which it had in inventory and for which it had paid.

Following a four-day bench trial, the district court rendered judgment in favor of Lancaster. After finding that the bulbs conformed to the contract specifications because they did not deviate from the toleranced dimensions indicated on the engineering drawing, the district court held that the variations of the non-toleranced diagonal angles did not render the bulbs defective. Therefore, the district court concluded, the tendered bulbs conformed to the contract. In the alternative, the district court held that the alleged noncomformities did not substantially impair the value of the contract to Philips as required by the Uniform Commercial Code §§ 2–608 and 2–612 to justify revocation of accepted goods and rejection of tendered goods. Finally, the district court concluded that Lancaster had not breached implied and express warranties. The court held that Philips' claim that Lancaster breached the implied warranty of fitness for a particular purpose, as provided by UCC § 2–315, failed because Philips could not prove that it relied on Lancaster's judgment to furnish suitable goods. The court further held that Lancaster did not breach implied and express warranties of merchantability because the bulbs were of an acceptable quality in the trade.

## III.

Philips voices three major objections to the district court's decision. First, it contests the court's conclusion that the tendered bulbs conformed to the contract. Philips argues that this conclusion is erroneous in light of the overwhelming evidence that the diagonal angles on the bulbs

---

**3.** On February 26, 1981, Philips ordered 4,611 LEA–1131B bulbs from Lancaster at a total order price of $82,536.90. These bulbs were released to Philips in April 1981, and invoices reflecting the purchase price were due and payable on May 21, 1981. Philips does not contest this contract, but it withheld payment as a set-off.

were significantly larger than the angles indicated on the engineering drawing. Second, Philips rejects the district court's alternative holding that, even if the bulbs did not conform to the contract, the alleged non-conformity failed to substantially impair the value of the contract. Philips claims that the contract is the exclusive source of its remedies and that, therefore, the "substantial impairment" requirement of UCC §§ 2–608 and 2–612 does not apply. Third, Philips objects to the court's conclusion that Lancaster did not breach implied and express warranties of merchantability. Philips argues that the district court did not apply the proper legal standard; Philips maintains that the bulbs must be suitable and sufficient for their ordinary and intended purposes. Philips contends that, if the court had applied this standard, it would have necessarily concluded that Lancaster breached implied and express warranties of merchantability.

■ Before addressing these arguments, we set out the standard of review.[4] Fed.R. Civ.P. 52(a) provides that findings of fact by the district court shall not be set aside unless they are clearly erroneous. When reviewing the district court's interpretation of a contract, however, an appellate court is not limited by the "clearly erroneous" rule. *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609, 612 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986). The interpretation and construction of a written contract, as required here, are matters of law, thus allowing de novo review. *Weimer v. Kurz–Kasch, Inc.,* 773 F.2d 669, 671 (6th Cir. 1985). Such de novo review permits us to draw our own inferences and legal conclusions from the record in the present case in determining whether the tendered bulbs conformed to the February 1930 contract and whether Lancaster breached implied and express warranties of merchantability.

## A.

The district court found that the terms of the contract between the parties are those set forth in Philips' purchase order. In that contract, Lancaster promised that the LEA–1015B bulbs to be delivered under that order would "conform to all specifications, drawings, [and] descriptions furnished, specified or adopted" by Philips. The district court acknowledged Philips' use of the Lancaster drawing, and the court concluded that, therefore, the engineering drawing was part of the contract between the parties. Thus, if the tendered bulbs did not conform to the drawing, Philips had the right to cancel the February 1980 order.

The district court concluded, however, that a preponderance of the evidence established that the tendered bulbs did conform to the drawing. In reaching this conclusion, the court emphasized the distinction between "toleranced" and "nontoleranced" dimensions. As discussed above, a toleranced dimension is shown on an engineering drawing by a nominal dimension followed by the range within which that dimension on the product may vary from the stated dimension and yet still be considered as conforming to the drawing's requirements. The court stated that "failure to keep a toleranced dimension with its specified variance renders a bulb defective." In contrast, the court reasoned, nontoleranced dimensions are not critical but are provided solely for reference purposes. The court then noted that the evidence established that "failure to maintain a non-toleranced dimension exactly at its reference dimension [is] not cause to classify a bulb as defective." Therefore, the court concluded, because the tendered bulbs did not deviate beyond the specified variances from the toleranced dimensions shown on the drawing, Lancaster satisfied its contractual obligation to provide bulbs which conformed to the drawing.

4. The contract expressly states that it "shall be construed under and governed by the laws of New York State," and neither party disputes that New York law applies. Throughout this opinion, however, we refer to the official text of the Uniform Commercial Code (9th ed. 1978) drafted by the American Law Institute because we understand that this code and the official comments have been adopted by the New York legislature.

While this reasoning is essentially sound, it is not dispositive because the court's analysis does not necessarily support its final conclusion. Surely, if Lancaster tendered bulbs with a dimension which exceeded the referenced dimension on the drawing by ten times the amount indicated, the court would have concluded that the bulbs did not conform to the drawing, regardless of whether the dimension was a "toleranced" or "non-toleranced" one. The distinction between "toleranced" and "non-toleranced" dimensions only aids in resolving one half of the issue. This distinction indicates precisely what the parties intended for the language "conform to the drawing" to mean with respect to toleranced dimensions. The crucial issue remains, however: what did the parties intend for the language "conform to the drawing" to mean with respect to a non-toleranced dimension like the diagonal angle?

Although the purchase order expressly prohibits the use of "course of prior dealings" between the parties or "usage of the trade" to explain this agreement, the contract does not preclude our examining the "course of performance." Under UCC § 2–208(1), when "the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." As comment 1 explains, "[t]he parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was."

The contract in dispute here clearly satisfies the prerequisites of section 2–208(1). Under the February 1980 contract, Lancaster released the LEA–1015B bulbs in incremental quantities designated by Philips. Further, beginning in August 1980, when it received the preliminary test results from Owens–Illinois, Philips knew that some of the diagonal angles on many of the bulbs were exceeding the one-and-one-half degrees called for on the drawing, and Philips had numerous opportunities to object to this course of performance. Therefore, if we find that Philips accepted or acquiesced in this course of performance without objection, Philips' conduct will help us determine what the parties intended the language "conform to the drawing" to mean with respect to the critical non-toleranced dimension, the diagonal panel skirt taper angle.

We believe Philips acquiesced, without objection, in Lancaster's repeated tendering of bulbs which had diagonal angles exceeding the non-toleranced dimension indicated on the engineering drawing. Philips first became aware of the T-band slippage problem in April 1980, and, by August, it had learned that the diagonal angle on some of the Lancaster bulbs were exceeding the dimension indicated on the engineering drawing. Although it strongly suspected the excessive slope was contributing to, if not causing, the slippage problem, Philips continued to accept several releases of bulbs under the February 1980 contract "without objection" despite numerous opportunities to voice its concern. Granted, Philips raised the issue in discussions with Lancaster, but it never did so in a way that can be considered as an objection that the tendered bulbs did not conform to the contract. For example, when Philips first discussed the problem with Lancaster in August 1980, Philips did not object to Lancaster's response that it could only change the slope of the diagonal angle on future production runs, after Philips completed the February 1980 order. Similarly, when Philips raised the T-band slippage issue during the January 1981 negotiations, by its own admission it did so merely as a "negotiating ploy" in an effort to obtain price concessions during a period when its sales were slow. Moreover, during this crucial period, Philips drafted an agreement which purportedly settled "all matters" pertaining to the February 1980 contact. Pursuant to that agreement, Philips subsequently accepted releases of LEA–1015B bulbs, bulbs which it knew would be in the same condition as those which Philips knew were not T-banding satisfactorily.

Therefore, because Philips, without objection, acquiesced in Lancaster's tendering of bulbs with excessive angles, we conclude that the bulbs conformed to the drawing, as Philips understood that phrase. Thus, the tendered bulbs conformed to the contract, and Philips was not justified in cancelling the February 1980 contract.

Because we conclude that the tendered bulbs conformed to the contract, we do not reach Philips' second argument, that the district court incorrectly held that the substantial impairment requirement of UCC §§ 2–608 and 2–612 applied despite express language in the contract, and that the court erroneously concluded that the non-conformance failed to satisfy this requirement.[5]

### B.

■ We now turn to Philips' third and final argument. The district court concluded that Lancaster had not breached implied and express warranties of merchantability because the tendered bulbs were of an acceptable quality in the trade. Philips maintains that the court did not apply the proper legal standard. Philips argues that the bulbs must be suitable and sufficient for their ordinary and intended purposes. Philips contends that, if the court had applied this correct standard, the court would have necessarily concluded that Lancaster breached implied and express warranties of merchantability because the evidence established that the tendered bulbs were not suitable and sufficient for T-banding, one of the bulbs' ordinary and intended purposes. To assess this argument, we must examine the implied warranties provided by the Uniform Commercial Code and the express warranties created by the contract.

When certain conditions attend a sales transaction, the UCC implies two types of warranties regarding the quality of the goods being sold. Under UCC § 2–314, if the seller is a merchant with respect to goods of that kind, the seller must provide goods that are "merchantable." UCC § 2–314(1). In order to be merchantable, the goods must, among other things, be "fit for the ordinary purposes for which such goods are used." UCC § 2–314(2)(c). Under some circumstances, section 2–315 adds an additional warranty: if the seller knows that the buyer requires the goods for a "particular purpose," and if the seller also knows that the buyer is relying on the seller to supply suitable goods, then the seller is obligated to provide goods which are "fit for such [particular] purpose." UCC § 2–315.

Philips claims that Lancaster breached the implied warranty of merchantability of § 2–314. Philips does not contest the district court's conclusion that Philips could not sustain a section 2–315 claim because Philips did not rely on Lancaster to select or produce goods suitable for the particular purpose of producing T-banded bulbs. Rather than challenging the court's "reliance" finding, Philips argues that the production of T-banded tubes was an ordinary purpose for which the bulbs were used. Therefore, Philips concludes, because the bulbs were not sufficient for that ordinary purpose, Lancaster breached the implied warranty of merchantability.

Philips also relies on a clause in the "warranties" section of the purchase order. As stated above, the contract obligated Lancaster to tender bulbs which were "merchantable and suitable and sufficient for their intended purposes." Arguably, the phrase "intended purposes" could be interpreted as providing a greater level of warranty protection than that provided by the UCC's implied warranty of merchantability. For example, the phrase could have

---

**5.** As previously mentioned, the district court held that the UCC's "substantial impairment" requirement was not displaced by the contract, and the court concluded that the alleged non-conformance did not satisfy this requirement. Although we do not need to discuss the merits of these conclusions, we are obliged to note that they do not constitute an adequate "alternative" holding. If Philips had proven that the tendered bulbs did not conform to the contract, but yet was unable to show that the non-conformance substantially impaired the value of the contract to it, the court was correct in holding that Philips was not justified in rejecting the bulbs. Philips, though, would nonetheless be entitled to a reduction in the contract price to compensate for the insubstantial non-conformance.

been designed to supply the kind of enhanced warranty protection provided by the UCC's implied warranty of fitness for a particular purpose. Throughout this appeal, however, Philips, the party which drafted the contract, has characterized this express warranty as an "express warranty of merchantability." Moreover, in its very brief discussion of this express warranty, Philips only cites one case, *Wullschleger & Co., Inc. v. Jenny Fashions, Inc.*, 618 F.Supp. 373 (S.D.N.Y.1985). That case, however, deals exclusively with warranties of merchantability, and the court's decision in favor of the seller was based solely on its finding that the goods were not suitable for their ordinary purposes. *Id.* at 375. Therefore, we believe that the contract's express warranty was intended by Philips to provide the same level of warranty protection as that provided by the UCC's implied warranty of merchantability.[6]

Thus, in order to sustain its claim that Lancaster breached express and implied warranties of merchantability, Philips must establish that the tendered bulbs failed to satisfy the merchantability standard codified by the drafters of section 2–314. The district court relied on language from comment 2 to section 2–314, which suggests that the goods "must be of a quality comparable to that generally acceptable in that line of trade." Philips maintains this standard is not the exclusive one for determining when the warranty of merchantability is breached. Philips looks to the specific language in the statute, and it argues that the goods must also be "fit for the ordinary purposes for which such goods are used." UCC § 2–314(2)(c). Philips claims that, because one of the ordinary purposes for which the bulbs were used was the production of T-banded tubes, and because the bulbs were not fit for that purpose, Lancaster breached the warranty of merchantability.

We disagree. The central problem is that the standard of merchantability can not be readily defined. The district court's "acceptable quality in the trade" standard is a satisfactory definition, and the evidence generally supports the court's conclusion that the tendered bulbs were acceptable in the trade. Philips' argument that the standard should be fitness for "ordinary purposes" does not undermine that conclusion. Here, as "in most cases, to say that goods are [or are not] fit for the ordinary purposes does little to advance the analysis; it simply substitutes one synonym for another." White and Summers, *Handbook of the Law Under the Uniform Commercial Code*, 353 (2d ed. 1980). We believe, therefore, that an examination of the underlying purpose of section 2–314 will aid in assessing the merits of the district court's conclusion that Lancaster did not breach the warranty of merchantability.

Sections 2–314 and 2–315 are "risk allocation" provisions. This category of Article Two provisions allocates commercial risks when the parties make no express agreement to the contrary. Schwartz and Scott, *Sales Law and the Contracting Process*, 3–5 (1982). Specifically, in every sale, the parties face the risk that the goods will be made as well as the seller intended, but the goods will prove to be unsuitable to the buyer's use. "Where that use is ordinary; the seller bears the risk. Buyer can reject well made but unsuitable goods. Where that use is 'particular'—noncustomary—the buyer bears the risk. He must accept well made but unsuitable goods or pay damages." *Id.* at 116. The risk of unsuitability shifts back to the seller under section 2–315, if the seller knows of the buyer's particular purpose, and if the buyer relies on the seller to provide goods which are suitable for that purpose. *Id.*

In short, " 'merchantable' is not a synonym for perfect." White and Summers, *supra*, at 356. The warranty of merchantability simply directs the seller to do what he typically does, and it informs the buyer that he should only expect to receive goods of the quality he typically gets.

---

**6.** Of course, had this express warranty been deemed to supply the kind of protection provided by the implied warranty of fitness for a particular purpose, Philips would not have had to show the reliance required under UCC § 2–315.

Under this analysis, Lancaster did not breach the warranty of merchantability by tendering bulbs which were not perfectly suitable for the new technology. The district court found that, during 1980, T-banding became Philips' primary implosion protection system. Therefore, when Philips placed the February 1980 order, shellbonding was the "customary" production process; T-banding was a non-customary, "particular" use. Thus, in order to provide "merchantable" bulbs under that contract, Lancaster merely had to supply the kind of bulbs which it had typically provided, and Philips could only expect to receive the kind of bulbs which it had typically received. The evidence shows that this is precisely what happened: Lancaster tendered the same kind of bulbs which Philips had purchased and successfully processed for several years. The holding that the bulbs conformed to Philips' contract is further support for our conclusion that Philips received the kind of bulbs it expected to receive and that Lancaster tendered the kind of bulbs which it typically tendered. If Philips wanted something different than that which it typically received, it was incumbent on Philips to indicate its changed demands, thereby shifting the risk of unsuitability for T-banding to Lancaster.

Accordingly, we hold that Lancaster did not breach implied and express warranties of merchantability.

### IV.

In sum, Philips must suffer the costs of a contract that went sour. In February 1980, when the parties were negotiating this sales agreement, Philips and Lancaster were the quintessential contracting parties. If Philips would agree to increase its order to 100,000 bulbs, Lancaster would significantly reduce the price of each unit. The resulting costs savings would further brighten the prospects for the strong sales year Philips was then forecasting. Lancaster would also profit if Philips increased the order. Lancaster would be able to buy all of the materials necessary to make the bulbs before the costs of those goods increased later in the year. The contract, in essence, represented a collective attempt to exploit a potential gain which could only be captured through the parties' mutual agreement. In most cases, the result of such cooperation is favorable: the gains are shared, and the parties look for future opportunities to profit through contracting.

Occasionally, however, unanticipated yet foreseeable risks materialize to diminish the value of the contract. Two such risks materialized here: the bulbs which Philips had always accepted without objection did not adapt well to a new technology, and the market for Philips' 12-inch cathode ray tubes dried up. Either risk, standing alone, could have undermined the value of the February 1980 agreement. When both risks surfaced during the contract period, though, the value of the agreement was completely destroyed, and someone had to bear the costs of those risks.

We believe the contract allocated these costs to Philips. It had been accepting these same bulbs, without objection, for several years. It was shifting to a new production process at the request of its customers. When the bulbs did not appear to be adapting well to this new process, Philips failed to renounce the contract quickly and unequivocally. This course of conduct suggests that it believed that the bulbs, despite varying slightly from the original engineering drawing, nonetheless conformed to that drawing as Philips understood that language, in a contract which it had drafted, to mean. Finally, it was Philips' customers who chose to frustrate Philips' expectations by failing to purchase as many 12-inch tubes as Philips had anticipated.

The district court judgment in favor of Lancaster is affirmed.