Alice Anna "Allie" **PHILLIPS,**
Plaintiff,

v.

**INGHAM COUNTY, Stuart J. Dunnings III, and Roger Fleming, Defendants.**

No. 5:04–CV–22.

United States District Court,
W.D. Michigan,
Southern Division.

March 21, 2005.

---

James K. Fett, Fett, Roumel & Fields, P.C., Pinckney, MI, for Plaintiff.

John R. McGlinchey, Cohl, Stoker & Toskey, P.C., Lansing, MI, for Defendants.

## OPINION

ENSLEN, District Judge.

Nothing defines human history like the collision of steadfast wills. When those wills are motivated not by self-interest, but by the highest impulses of duty and self-less love, then even the gods in heaven abandon their chores and keenly watch the tragedy sure to unfold below. Watch now as the story unfolds.

### FACTUAL BACKGROUND

Plaintiff Allie Phillips was and is, by all accounts, a talented lawyer and lover of animals. She did her job as an Assistant Prosecutor for Ingham County admirably and to the satisfaction of her superiors. (Dunnings Dep. at 5.) While a lawyer, her chief non-legal avocation was the advocacy for and rescue of unwanted animals, cats and dogs, collected by the Ingham County Animal Shelter. Due to her dedication, she was elected president of the Friends of the Ingham County Animal Shelter, an organization she helped to establish. As part of this avocation, she also befriended and assisted Defendant Roger Fleming, the then Director of the Ingham County Animal Shelter. He gave her a key to the Shelter so that she could assist there and use the Shelter for animal fund raising events. (Phillips Dep. at 288–90.)

Managing an animal shelter is under our laws, unfortunately, a dirty job. The sad fact of it is that many of the animals found will not be returned to owners or adopted, but will be euthanized. Under Michigan

statute, a marked[1] stray animal is considered property of the legal owner for a seven-day statutory period, during which time, the owner may make a claim for the animal with the shelter. *See* Mich. Comp. Laws § 287.388; *see also Rockwell v. Oakland Circuit Judge*, 133 Mich. 11, 94 N.W. 378, 378–79 (1903) (stating that Michigan had abandoned the common law rule that dogs were base property which could not be stolen); *Finley v. Barker*, 219 Mich. 442, 189 N.W. 197, 197 (1922) (same). After that period, shelters permit the "adoption" of the animal (meaning the transfer of the animal to a new owner for the purpose of companionship). *See* Mich. Comp. Laws §§ 287.331(a) and 287.338a. The shelter may also either euthanize the animal or sell it for a $10 fee for use in research. *See* Mich. Comp. Laws §§ 287.388–287.389.

Prior to the events at issue, Defendant Fleming had interpreted the state's laws as permitting him to sell dogs and cats to class B dealers for re-sale to research institutions.[2] This practice had been commonplace in Ingham County because of Michigan State University's use of a large number of research animals. Controversy accompanied this practice for obvious moral and ethical reasons relating to the treatment of animals. In light of such controversy, the County had adopted, by resolution, a policy permitting a lawful owner whether or not the animal was marked, even after the sale of an animal for research purposes, to redeem a cat or dog, to the extent possible, by making a claim of ownership with the Shelter and by paying costs associated with the animal's care.[3] (Fleming App., Ex. H; Felming Dep. at 123–24.)

Having painted the prelude of the events, what follows is the story of a sale of an animal to a class B dealer and the animal's illicit rescue by the Assistant Prosecutor. Most, if not all, of the facts are agreed; though their legal consequences are the subject of furious debate.

On or about February 1, 2003, Phillips sent an e-mail to Carrie Schotte, an animal rescue friend, which states:

> Hi Carrie! I have a favor to ask? I'm not sure if you've been updated by Teresa or read the Lansing State Journal today about the problems at the shelter? Anyway, would you be willing to play the part of a person who lost her black cat and because of where you lived you never thought to go to the Ingham County Animal Shelter to look for her? We had one of our beloved shelter cats, Karyn, sold to a Class B Dealer this

---

1. Meaning an animal bearing some "evidence of ownership."

2. A "class B licensee" is the federal classification for licensing purposes of the Department of Agriculture under 9 C.F.R. § 1.1 (definitions) and the Laboratory Animal Welfare Act of 1966, 7 U.S.C. §§ 2131–2159. Generally speaking, class A dealers breed and sell animals for domestic use. Class B dealers purchase and re-sell animals (primarily to research institutions). Class C dealers are animal exhibitors. *See* 9 C.F.R. § 1.1 (definitions). Fleming's construction of the state's laws was controversial since it seemed to contradict the Michigan statute. *See* Mich. Comp. Laws § 287.389. Indeed, Plaintiff and her union representative took this position and viewed the sale to any class B dealer in Michigan as void under statute. (*See* Pls.' Resp. to Dunnings' Mot., Ex. BB.) In any event, the outcry from Lansing citizens, after the events described in this suit, resulted in the Lansing Board of Commissioners forbidding future Shelter sales to class B dealers (though not direct sales to Michigan State University and other research institutions). (Phillips Dep. at 204; Fleming Dep. at 134–35.)

3. Class B dealers are subject to a mandatory holding period. *See* 9 C.F.R. §§ 2.101(a), 2.132(e)(3). Among the purposes of the holding period is the prevention of profiteering on the sale of stolen and/or missing animals. *See* 7 U.S.C. § 2131(3); 9 C.F.R. § 2.128.

past week for purposes of research. We are all devasted. We're trying to find a way to get her back. In the past, the shelter director and the class B dealer have said that if an owner steps forward, they will return the animal to its owner. In June 2001, I tested that and both the shelter director and the class b dealer were caught in a lie because they didn't return the cat. I want to test this again, but I need someone from just outside Ingham County to play the part of the pet owner. I can give you more details about how this can work if you're willing to do it? It would require you to call the shelter first thing Monday morning and even possibly go to the shelter with a photo of the cat (which Christine in our group can provide). Let me know what you think? By the way, Kipling is doing great!

(Fleming App., Ex. C.) The references to play acting are consistent with Plaintiff's theory of this case—that she and her helpers were properly investigating and "testing" the responses of the Shelter.[4]

Upon receipt of the e-mail, Schotte agreed to the request. (Schotte Dep. at 33–34.) Plaintiff then had further conversations with Schotte about how to tell a convincing story of animal ownership to the Shelter, including a discussion of details about when the cat was "lost," about whether the cat was sterilized, the size of the cat, and the "discovery" of the Shelter's possession of the cat by reading an advertisement posted by the Friends of the Ingham County Animal Shelter in the *Wheeler Dealer* magazine. (Schotte Dep. at 37, 39; tel. notes, Pl.'s Resp. to Ingham Co.'s Mot., Ex. Y.)

Shotte made her telephone call to the Shelter on February 3, 2003 and relayed the rehearsed story, including the "detail" that she did not have veterinarian records because she did her own vet work. (Schotte Dep. at 43–44.) She then e-mailed Phillips with questions. Phillips responded on February 4, 2003 as follows:

I don't know how we can get the cash to you by tomorrow. I'm in a trial all day and Christine is sick. Christine will get in contact with you about where to take her when you get her. Those creeps always take checks from people. Can you pay by credit card? Let us know if you want the full $300 reimbursement or parts? I have a few people willing to donate (even though they don't know the cause). Thank you so much for doing this. Can you give Christine the tape recording of the message Steve left for you, plus any conversations you record tomorrow?

(Ingham Co. Br., Ex. 10.)

Following this advice, Schotte went to the home of Christine Knetchel who, it had been arranged, was to provide Schotte with a cat carrier and cat photographs to "prove ownership." (Schotte Dep. at 49.) Knetchel told Schotte to bring the cat to Knetchel's apartment. (*Id.* at 50.) Schotte then went to the Shelter, identified

---

4. Plaintiff compares her efforts to civil rights/fair housing advocates who misrepresent their intention to lease homes for the purpose of ridding housing discrimination. *See Havens Realty v. Coleman*, 455 U.S. 363, 373, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Defendants dispute the analogy. Indeed, fair housing testing does not typically involve formal misrepresentations as to property ownership which result in the disposition of the property to a non-owner. These misrepresentations were also significant in terms of federal regulations which prohibit any person from "obtain[ing] live random source dogs or cats by use of false pretenses, misrepresentation or deception." 9 C.F.R. § 2.132(e). Likewise, they were significant under state law because owners and non-owners are subject to different legal requirements when redeeming an animal. *See* Mich. Comp. Laws § 287.338a(a) (requiring non-owners to submit to sterilization of adopted animals).

the cat as her own, and showed the photographs. (Schotte Dep. at 51–52; Fleming Dep. at 126.) She also signed a statement which read:

I declare that I am the owner/authorized agent of the owner (strike one) of the above described animal and that the information above is true to the best of my knowledge and belief.

(Fleming App., Ex. E.) The form was notarized, though apparently, the notarization was done outside of the presence of the signatory. (Dawn Perry Dep. at 30–31.). Schotte also failed to strike any language on the form. (Fleming App., Ex. E.)

Upon completion of the form and the payment of $295 for the boarding of the pet, the cat was released to Schotte. (*Id.*) Hot on her heels was Roger Fleming who smelled a rat.[5] He followed Schotte to Knetchel's apartment in Mason, Michigan where the cat was delivered. (Fleming Dep. at 128; Schotte Dep. at 55–57.) He then followed Schotte to Jackson, Michigan. (Fleming Dep. at 131–32.) There he identified himself as the Shelter Director and asked her if she was involved in criminal conduct. (*Id.* at 133.) She and Fleming then went to a nearby Bob Evans restaurant where she admitted that she

was not the owner of the cat, admitted that she was acting at the direction of Phillips, and provided a written statement of her admissions. (Fleming App., Ex. G.) She also provided copies of her handwritten notes of telephone conversations with Phillips and of e-mail messages sent to her by Phillips.

Based on these admissions, Fleming then filed papers with the Prosecutor seeking a search warrant of Knetchel's apartment on the theory that she had conspired to commit the offense of larceny under $200 by false pretenses.[6] The warrant request was prepared by the Prosecutor and presented to an examining magistrate, who approved it. (Ingham Co. Br., Ex. 15.) Fleming and several Sheriff Deputies then searched the residence—though the only thing of substance found were the photographs that Schotte had used to prove animal ownership. (Fleming Dep. at 142–43.) The cat was not discovered, (*id.*), because Knetchel had removed and transferred her to friends before police arrived. (Phillips Dep. at 72–78.). So, presumably, this story has ended happily for Karyn.[7]

Roger Fleming[8] then compiled an investigative report relating to this matter.

---

**5.** Fleming had been deputized as a law enforcement officer of the County, which authority he was none too shy to use. He knew that some game was at play because he had received a Freedom of Information Act request concerning the disposition of the cat. (Fleming Report, Pl.'s Ex. W–1, at 1.)

**6.** Indeed, the Ingham County Prosecutor's Office had previously prosecuted and convicted an individual of larceny by false pretenses relating to an incident in October 2002 (false claim of ownership as to a Rottweiler) in which a claimant's claimed ownership were proven false by evidence of the true owner. (Fleming Dep. at 96–97.)

**7.** Phillips testified that Karyn was at a safe location unbeknownst to her, which testimony was variously described as placement in the

witness protection program. (Phillips Dep. at 72.) The reader may make his or her own judgment as to whether the story has ended happily for other cats and dogs. While animal rights advocates generally believe, with good reason, that class B dealers do not treat animals as well as research institutions, the effect of the change in policy wrought by this case will be in some cases to shorten the life span of some cats and dogs sold for research because the additional holding period applicable to class B dealers has been lost to the animals in the process. *See* 9 C.F.R. § 2.132(e)(3).

**8.** About this same time, Fleming made the "Friends of the Ingham County Animal Shelter" the ex-friends by disassociating himself and the Shelter with any of their work.

(Fleming Report, Pl.'s Ex. W–1 & W–2.). The report was forwarded to the Prosecutor. Prosecutor Dunnings had then Chief Assistant Prosecutor Joyce Draganchuk[9] draft a request for a special prosecutor (due to conflict of interest) which by law was directed to Michigan's Attorney General. (Draganchuk Dep. at 21; Ingham County Br., Ex. 18.)

At the same time the criminal process was marching forward, Dunnings had set in motion an administrative process to determine whether Phillips should be fired. Under state law, an assistant prosecutor is an at-will employee of the county prosecutor, but cannot be fired for illegal reasons such as race, gender, ethnicity and constitutionally protected conduct. The Ingham County assistant prosecutors were unionized and Phillips was represented in administrative matters by a union representative, Guy Sweet. Sweet and Phillips met with Dunnings on February 18, 2003. Dunnings expressed his belief that Phillips had committed criminal conduct. (Phillips Dep. at 238–39.) Sweet then asked Dunnings to review a memorandum he would prepare explaining why the conduct was not criminal. (Sweet Dep. at 48.) Sweet, true to his word, did draft such a memorandum, dated February 26, 2003. (Pl.'s Resp. to Dunnings' Mot., Ex. BB.)

Before the memorandum was finished, though, Dunnings told Sweet that he believed that Phillips' conduct was in violation of the Michigan Rules of Professional Responsibility and that he would report this negative information to the United States Attorney's Office, who had contacted him for a job reference.[10] (Dunnings Dep. at 100–05; Sweet Dep. at 58–59.) On February 28, 2003, Phillips was suspended from her duties for "suborning a citizen to make a false sworn statement to an agency of your employer, Ingham County." (Pl.'s Resp. to Dunnings' Mot., Ex. CC.) According to Schotte, though, no subornation occurred in that she and Phillips had never discussed *per se* the making of a false sworn statement. (Schotte Aff., Pl.'s Ex. Z, at ¶¶ 3–4.)

On March 13, 2003, Dunnings and Phillips learned that the Attorney General had declined prosecution. (Sweet Dep. at 74; Phillips at 192–93.) The next day the Attorney General issued a written decision declining prosecution, which relied in part on the Sweet memorandum. To put it bluntly, the Attorney General saw that it might be hard to convince 12 citizens beyond a reasonable doubt that the three conspiracy members had criminal intent to trick the Shelter or the class B dealer out of less than $200 of property when they had spent $295 to make the purchase (in addition to certain other arguments mentioned in the Sweet memorandum). (*See* Pl.'s Resp. to Dunnings' Mot., Ex. JJ.)

March 13, 2003 was also a bell weather day for the parties because they had an administrative meeting relating to the discipline of Phillips. At the meeting, Dunnings requested Draganchuk question Phillips about the incident. Before she did, Sweet gave her the warnings suggested by the Supreme Court's decision in *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) and later case law—*i.e.*, your employer can fire you for refusing to answer the employer's questions about the subject of the investigation, but any statements you make under these conditions cannot be used in a

---

**9.** Since then, she has been elevated to the Ingham circuit bench.

**10.** Shortly thereafter, Phillips, who had been a finalist for a position in the United States Attorney's Office for the Western District of Michigan, learned that she was not offered that position. She did not ask and was not told why she did not obtain the position.

later criminal prosecution of you. *See Hill v. Johnson*, 160 F.3d 469, 471 (8th Cir. 1998) (summarizing *Garrity* case law). In light of the warnings, Phillips did discuss her involvement during a lengthy interview lasting some two hours or more. (Phillips Dep. at 194.)

The March 13th meeting and the March 14th decision of the Attorney General did nothing to change minds. On March 14, 2003 and thereafter, both Dunnings and Flemming continued to make statements condemning Phillips' conduct as wrongful and criminal. On March 19, 2003, Dunnings and Phillips had a final meeting. At that meeting, Dunnings asked Phillips to admit that what she had done was unequivocally wrong (and so apologize to the Board of Commissioners, staff, *et cetera*). Her answer was that she would not lie to save her job. (Phillips Dep. at 201.) When she refused to do so, he withdrew her appointment and publicized his reasons for so doing, including violation of Michigan Professional Rule 8.4(b) ("... dishonesty ... [which] reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer[.]") (Pl.'s Resp. to Dunnings' Mot., Ex. II.) Afterwards Phillips could not find work in Michigan so left for employment in Virginia. She then filed suit asserting both a First Amendment retaliation claim (pursuant to 42 U.S.C. § 1983) as part of the Court's federal question jurisdiction under 28 U.S.C. § 1331 and several state law claims as part of the Court's diversity jurisdiction under 28 U.S.C. § 1332.

### SUMMARY JUDGMENT STANDARDS

All three Defendants have brought summary judgment motions pursuant to Federal Rule of Civil Procedure 56. Under the language of Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

In assessing evidence, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions. *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir.1994). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Although factual conclusions must be drawn in favor of the non-movant, the reviewing court is not bound by the legal conclusions of the parties. *See Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir.2002); *Lancaster Glass Corp. v. Phil-*

*ips ECG, Inc.*, 835 F.2d 652, 658 (6th Cir.1987). Rather, the Court reviews those conclusions *de novo* in order to settle upon the most appropriate application of the law. *Id.*

### LEGAL ANALYSIS

#### 1. Section 1983 Liability

Phillips claims that Dunnings retaliated against her for the making of statements about matters of public concern, citing *Mt. Healthy v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Phillips also claims that she had a right to not engage in offensive speech and cannot be discharged for refusing to make public statements with which she strongly disagrees. She also claims that Ingham County is liable for her damages in connection with her termination because Dunnings was the County's authorized decision-maker with respect to her employment.

■ The basic contours of the Supreme Court's *Mt. Healthy* jurisprudence are well-known. To prove a First Amendment retaliation claim under 42 U.S.C. § 1983 the employee must show that:

(1) [s]he was engaged in a constitutionally protected activity; (2)[s]he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a 'substantial' or 'motivating factor' in the adverse action.

*Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir.2003). "Constitutionally protected activity" means that the speech relates to a matter of public concern, *see Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir.2001), and that the employee's interest in the speech outweighed the employer's interest in "promoting the efficiency of the public services it performs through its employees[,]" *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). If the employee can make this showing, the burden shifts to the employer to prove, by a preponder-ance, that "it would have taken the same action even in the absence of the protected conduct." *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir.1999) (citing *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568).

■ Page 17 of Phillips' Response to Defendant Stuart Dunnings' Motion outlines her theories of liability on this claim. The protected conduct is variously described as statements by a city commissioner (not by Phillips) and the reactions of the media. Neither of these matters are speech by Phillips, let alone protected speech. Therefore, they provide no basis for First Amendment liability.

■ Plaintiff's argument about the proposed Reinstatement Agreement, though, is a far graver matter. It is true that the proposal of the Reinstatement Agreement required, as a condition, public speech on a matter of public concern and private conscience (the apology). It is also true that Phillips was discharged when and because she refused to engage in the offensive speech. The dearth of case law on this subject, as demonstrated by the briefing, shows exactly how unique a situation like this one is. Nevertheless, the United States Supreme Court has held in such cases as *Wooley v. Maynard*, 430 U.S. 705, 715–16, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) that the right to not engage in offensive speech is protected under the First Amendment and cannot be infringed absent a showing that the interest is overcome by a sufficiently countervailing interest of the State. In other words, public employers who require public apologies as a condition for continued employment will be liable absent proof, under the *Pickering* standards, that the employer's interest in the required speech outweighs the employee's interest in her freedom of speech.

■ Although trepidation should also accompany new law, the Court finds as a matter of law that the employer's interests

in promoting the statutory duties of county prosecutor clearly outweighed his employee's interests in unfettered speech. An assistant prosecutor must prosecute consistent within the lawful guidance of the prosecutor, who is the duly elected county official responsible for county prosecution. In this case, Phillips engaged in conduct which approached criminal conduct. The conduct was admittedly dishonest, though it was perpetrated for the purpose of securing what Phillips believed to be higher ethical ends (so as not to reflect badly on her professional integrity, in her view). The problem with Phillips' analysis is, as far as the Court can see, that no existing legal authority sanctions these kind of misrepresentations of animal ownership. Indeed, both the state and federal systems for regulation of shelters and animal dealers depend on the honest reporting of citizens as to facts about animal ownership. Given this, Dunnings was right to conclude that Phillips had violated section 8.4(b) of the Michigan Rules of Professional Conduct. He was right to conclude that she should apologize in order to regain his trust. He was also right to seek Phillips' reassurance of Ingham County citizens that the obligation of honest legal reporting is not lost on county prosecutors. Accordingly, the Court finds that both Dunnings and Ingham County [11] are entitled to judgment as a matter of law as to the federal claims.

### 2. State Law Claims

■■■■ Since these motions pertain to matters of state law, the Court must apply state law as determined by the state's highest court. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If a state's highest court has not spoken to an issue, the Court must determine state law based on "all relevant data," including decisions of intermediate state courts, decisions of federal courts interpreting state law, case precedents from other states, and scholarly commentary. *Garden City Osteopathic Hosp. v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir. 1995) (citing cases). In this process, intermediate state court decisions are especially important unless the other data suggest that the state's highest court would not follow such decisions. *Id.*

### A. Defamation

Phillips has made defamation claims against both Dunnings and Fleming. Plaintiff claims that Flemings and Dunnings made statements variously accusing her of immorality, larceny, suborning perjury, and professional ethical violations. Some of the accusations were published in print or electronic media and are deemed libel. Other of the accusations relate to spoken defamation and are deemed slander.

■■■■ The Michigan Court of Appeals recently gave an apt overview of defamation, which is applicable here:

> In order to establish a claim of defamation, a plaintiff must show: (1) a false or defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm (defamation *per se* ) or the existence of special harm caused by publication (defamation *per quod).* *Id.* "When addressing a defamation claim, a reviewing court is required to make an independent examination of the record to

---

**11.** This was the sole claim against Ingham County which required resolution because Plaintiff admits in her Response memorandum that immunity precludes all state law claims against Ingham County. (Pl.'s Resp. to Ingham Co.'s Mot. at 13, 15.)

ensure against forbidden intrusions into the field of free expression." *Id.*

Because Dr. Mino is a public figure, he "must prove by clear and convincing evidence that the publication was a defamatory falsehood and that it was made with actual malice through knowledge of its falsity or through reckless disregard for the truth." *Id.* at 624, 617 N.W.2d 351. " 'Actual malice is defined as knowledge that the published statement was false or as reckless disregard as to whether the statement was false.... [I]ll will, spite, or even hatred, standing alone, do not amount to actual malice.' " *Ireland v. Edwards,* 230 Mich.App. 607, 622, 584 N.W.2d 632 (1998), quoting *Grebner v. Runyon,* 132 Mich.App. 327, 332–333, 347 N.W.2d 741 (1984) (citations omitted).

*Mino v. Clio School Dist.,* 255 Mich.App. 60, 661 N.W.2d 586, 594–95 (2003).

The Court of Appeals' statements in the *Collins* case are also noteworthy for their discussion of truth in the context of defamation law:

To avoid liability, it is not necessary for "defendants to prove that a publication is literally and absolutely accurate in every minute detail." *Rouch, supra* at 258, 487 N.W.2d 205. Rather, substantial truth is an absolute defense to a defamation claim. *See Masson, supra* at 516–517, 111 S.Ct. 2419, 115 L.Ed.2d 447; *Rouch, supra* at 258–259, 487 N.W.2d 205. Michigan courts have held that " '[s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.' " *Id.* at 258–259, 487 N.W.2d 205, quoting 3 Restatement Torts, 2d, § 581A, comment f, p. 237. " 'It is sufficient for the defendant to justify so much of the defamatory matter as constitutes the sting of the charge, and it is unnecessary to repeat and justify every word ... so long as the substance of the libelous

charge be justified,' " and " 'the inaccuracy in no way alters the complexion of the affair, and would have no different effect on the reader than that which the literal truth would produce....' " *Rouch, supra* at 259, 487 N.W.2d 205, quoting *McAllister v. Detroit Free Press Co.,* 85 Mich. 453, 460–461, 48 N.W. 612 (1891). "Thus, the test look[s] to the sting of the article."

*Collins v. Detroit Free Press, Inc.,* 245 Mich.App. 27, 627 N.W.2d 5, 9 (2001).

In the instant case, the statements by Dunnings and Fleming were made about an Assistant Prosecutor as to matters of public concern. As such, Phillips must show actual malice. *See, e.g., Henry v. Collins,* 380 U.S. 356, 357, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965) (holding that chief of police is public official); *Time, Inc. v. Pape,* 401 U.S. 279, 284, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (accepting lower courts' determination that city's Deputy Chief of Detectives was public official).

Upon review of the speech at issue, the Court finds that the defamation claims should be dismissed because the speech is substantially true and because Plaintiff has not shown actual malice on the part of Defendants. Even though Phillips was not charged with larceny under $200, her conduct was similar in character to larcenous conduct in the County which had recently been charged as criminal. As such, the Court finds these statements to be substantially true as a matter of law.

As to the statements about suborning perjury, they too were substantially true given the evidence that Phillips had directly engaged in a scheme to have Schotte make materially false misrepresentations of ownership. Though the fact of the lack of contemporaneous notarization is not a purely idle fact, it does not go to the "sting" of the charge—intentional false-

hood to government officials as to a statement to prove ownership. Defendants were also free, in their exercise of independent judgment, to conclude from their investigations that Phillips knew the inner workings of the Shelter and was encouraging all manner of illegality, including the making of false sworn statements, to save the cat. Likewise, the accusation of an ethical violation was, in the Court's view, well-founded.

Therefore, Defendants are entitled to summary judgment on these claims.

## B. Interference with Business Expectancies

 As for Plaintiff's claims of tortious interference with a business expectancy, Defendants Fleming and Dunnings are also entitled to summary judgment. Under Michigan law, the elements of this tort are:

> (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy by the defendant; (3) intentional interference by the defendant which induces or causes a breach or termination of the relationship or expectancy; and (4) damage to the plaintiff. *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 217 Mich.App. 687, 698, 552 N.W.2d 919, 925 (1996) (per curiam). A plaintiff seeking to establish a tortious interference claim must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship.

*Bliss Clearing Niagara, Inc. v. Midwest brake Bond Co.*, 339 F.Supp.2d 944, 972 (W.D.Mich.2004).

 In the instant case, Phillips' evidence of interference fails to support several of the required elements. Phillips' various job applications, on the existing record, were reasonable hopes. There was no proof that she was reasonably likely to obtain the employment in the absence of the interference. Further, as determined above, Defendants' various statements about the cat incident were proper and not tortious (even though few if any of those statements were made in connection with applications for employment). Therefore, summary judgment is warranted on these claims.

## C. Malicious Prosecution

 Phillips has sued both Dunnings and Fleming for malicious prosecution in connection with their failed prosecution of her. Dunnings cannot, as a matter of law, be liable for malicious prosecution because the Michigan Supreme Court has flatly told us that a "public prosecutor is not liable for malicious prosecution[,]" due to absolute immunity.[12] *Matthews v. Blue Cross & Blue Shield of Mich.*, 456 Mich. 365, 572 N.W.2d 603, 610 (1998). Fleming, as a complaining public official witness, though, has some potential for liability since he is only protected by qualified governmental immunity.[13] *Id.* at 610–11.

 As to the tort of malicious prosecution, the Michigan Supreme Court itself recently gave a primer on the Michigan tort of malicious prosecution in the case of *Radzinski v. Doe*, 469 Mich. 1037,

---

12. Immunity was asserted as a defense in the Answer and has not been waived by Defendants.

13. Fleming's immunity is complicated by the fact that he was serving two different roles: (1) as director of the Shelter; and (2) a deputy sheriff. As to the malicious prosecution claim, the claim relates mostly to his deputy sheriff role such that he is protected only by qualified governmental immunity. *See* Mich. Comp. Laws § 691.1407.

677 N.W.2d 796, 798 (2004). Therein, the Michigan Supreme Court noted that this tort was one of the least favored torts available for suit because of its potential to undermine an effective use of the criminal processes. Thus, consistent with prior cases such as *Matthews*, it required the proof of four elements: (1) a defendant's initiation of criminal proceedings against a plaintiff; (2) termination of the proceedings in plaintiff's favor; (3) absence of probable cause for initiation of the proceedings; and (4) initiation was done with malice (*i.e.*, the primary purpose was other than bringing plaintiff to justice). *Radzinski*, 677 N.W.2d at 796–97; *see also* Mich. Civ. J.I. 117.01. Further, an absence of probable cause means, as the Michigan Supreme Court said in *Roblyer v. Hoyt*, 343 Mich. 431, 72 N.W.2d 126, 128 (1955), "a complete absence of probable cause." "It is absolutely essential, then, that there be a complete absence of probable cause for the prosecution of the action." *Id.*

■ In the instant case, there was probable cause to believe that a crime was committed notwithstanding the decision of the Attorney General to not prosecute. Also, the record does not support a finding of malice. Therefore, Defendants are entitled to summary judgment as a matter of law on the claim of malicious prosecution.

### D. Abuse of Process

Phillips has sued Dunnings and Fleming for abuse of process. This tort is a cousin of the malicious prosecution tort and is similarly regarded under Michigan law.

■ There are two elements of the tort: "(1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc*, 412 Mich. 1, 312 N.W.2d 585, 594 (1981).

■ This tort was well-explained by the Michigan Court of Appeals in its 1977 decision in *Three Lakes Ass'n v. Whiting*, 75 Mich.App. 564, 255 N.W.2d 686, 690 (1977), based on Prosser's famous treatise:

> Perhaps the best explanation is found in Prosser, *Torts* (4th ed.), § 121, p. 857:
>
>> "Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." (Emphasis added.) (Footnote omitted.)

In Harper & James, *The Law of Torts*, vol. 1, § 4.9, p. 331, it is said:

> "If the process is employed from a bad or ulterior motive, the gist of the wrong is to be found in the uses to which the party procuring the process attempts to put it. If he is content to use the particular machinery of the law for the immediate purpose for which it was intended, he is not ordinarily liable, notwithstanding a vicious or vindictive motive. But the moment he attempts to attain some collateral objective, outside the scope of the operation of the process employed, a tort has been consummated." (Emphasis added.)

*Id.*

■ In this case, the facts on the record do not support any such claim against any Defendant. There was no irregular

use of the legal process. There is no proof of an "ulterior purpose." [14] There is simply no tort.

### E. Intentional Infliction of Emotional Distress

 No foray into the disfavored torts of Michigan law is complete without a visit of the tort of intentional infliction of emotional distress. Phillips has claimed that Flemming and Dunnings' conduct caused her to suffer extreme emotional distress requiring professional help. To prove such tort under Michigan law requires proof of "(1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Doe v. Roman Catholic Archbishop of Archdiocese of Detroit*, 264 Mich. App. 632, 692 N.W.2d 398, 405 (2004).

In this case, there is no proof of "extreme and outrageous conduct" directed toward Phillips. Accordingly, Defendants are entitled to summary judgment.

### CONCLUSION

Given the above analysis, Defendants are entitled to a Judgment dismissing all of Plaintiff's claims. This is a Judgment of law only. The moral rectitude of what was done and why are matters which can and should continue to fill debates among activists, ethicists, theologians and philosophers. Given the determination shown of the parties of this suit, it is clear that these kinds of debates are by no means over.

---

**14.** The case of *Vallance v. Brewbaker*, 161 Mich.App. 642, 411 N.W.2d 808, 810 (1987) held that an ulterior purpose must be proven by a corroborating act. This has not been shown here.